UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

TERRY PHILLIPS SALES, INC., *et al.*,

                        Plaintiffs,

v.

SUNTRUST BANK, *et al.*,

                        Defendants.

Civil Action No. 3:13–CV–468

## MEMORANDUM OPINION

THIS MATTER is before the Court a Motion to Remand (ECF No. 7) filed by Plaintiffs Terry Phillips Sales, Inc. ("TPS"), Cathy Phillips, and Terry Philips and a Motion to Strike Jury Demands (ECF No. 9) filed by Defendant SunTrust Bank ("SunTrust"). For the reasons below, the Court will DENY the Motion to Remand because diversity jurisdiction is present where nondiverse defendants Claire E. Craighill ("Craighill"), Gary N. Witthoefft ("Witthoefft"), and Kenneth E. Sigmon ("Sigmon") (collectively "Nondiverse Defendants") have been fraudulently joined. The Court will GRANT the Motion to Strike Jury Trial Demands.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an Employee Stock Ownership Plan ("ESOP") created on August 1, 2003, between TPS and SunTrust. SunTrust advised Plaintiffs that they should sell 4,750 shares of common stock (95% of TPS's stocks) to the ESOP for the total purchase price of $19,500,000 ($4,105.26 per share) in return for a promissory note from the ESOP ("ESOP Note"). SunTrust controlled all aspects of the offer and sale of the shares. When the principal amount of the ESOP Note was reduced to $17,007,500, SunTrust then advised TPS to make a loan to the ESOP. In September 2004, SunTrust made a term loan to TPS in the amount $8,000,000 ("Term Loan"). TPS, in turn, loaned the $8,000,000 to the ESOP ("ESOP Loan"). The ESOP Loan was secured

by a pledge of 1,943 shares of TPS. TPS never actually obtained the proceeds of the ESOP Loan. Instead, as part of the SunTrust ESOP Investment Program, SunTrust required that the funds be used to purchase securities called "floating rate notes" ("FRN").[1] (Compl. ¶ 14). Under the ESOP Loan, the ESOP—and thus TPS—was required make principal payments of $533,333.33 plus pay SunTrust four percent (4%) simple interest per annum ($320,000 per year) on December 31 of each calendar year through 2018.

As collateral for payment of the Term Loan, SunTrust required TPS to grant it a security interest in (i) $19,500,000 in floating rate securities purchased as part of the SunTrust ESOP Investment Program and held by SunTrust; (ii) $6,000,000 in cash, bonds, and marketable securities held by SunTrust; (iii) all the assets of TPS, Phillips Land, LC, Capitol Distributing, LLC, and SouthPeak Interactive, LLC; (iv) assignment of life insurance policies insuring Terry Phillips's life (face value not less than $3,500,000); (v) all of the issued and outstanding shares of stock of TPS; (vi) the property described in a certain security agreement dated as of September 13, 2004; and (vii) the property described in the ESOP Loan agreement.

In 2004, along with the Term and ESOP Loans, SunTrust established lines of credit in the principal amounts of $13,162,500 and $4,387,500 in favor of Terry and Cathy Phillips[2] (collectively, "ESOP Lines of Credit"). As collateral for the payment of the ESOP Lines of Credit, SunTrust required Terry and Cathy Phillips to grant SunTrust a security interest in (i) $19,500,000 in floating rate securities purchased as part of the SunTrust ESOP Investment Program and held by SunTrust; (ii) $6,000,000 in cash, bonds, and marketable securities held by SunTrust; (iii) all the assets of TPS, Phillips Land, LC, Capitol Distributing, LLC, and SouthPeak Interactive, LLC; (iv) assignment of life insurance policies insuring Terry Phillips's

---

[1] Suntrust acted as broker for Terry and Cathy Phillips in the purchase of the floating rate securities, charging commissions on the purchases and sales it made between 2004 and 2013. (Compl. ¶ 14). SunTrust exercised discretion and chose the debt securities for Terry and Cathy Phillips. Suntrust represented to Plaintiffs that the purpose of the FRNs was to generate at least sufficient income to pay the costs of the Term Loan and ESOP Lines of Credit, so that Plaintiffs would never incur out-of-pocket loss.

[2] Additionally, two other people by the names of Greg and Susan M. Phillips established ESOP Lines of Credit.

life (face value not less than $3,500,000); (v) all of the issued and outstanding shares of stock of TPS; (vi) the property described in a certain security agreement dated as of September 13, 2004; and (vii) the property described in the ESOP Loan agreement.

As collateral for the ESOP Lines of Credit, SunTrust required Plaintiffs, Phillips Land, LC, Capitol Distributing, LLC, and SouthPeak Interactive, LLC to unconditionally guaranty and cross-guaranty all obligations to SunTrust. SunTrust also required Phillips Land, LC, Capitol Distributing, LLC, and SouthPeak Interactive, LLC to pledge all "now owned and hereinafter acquired" personal property as collateral for the ESOP Lines of Credit. (Compl. ¶ 15). SunTrust then required Plaintiffs to subordinate the ESOP Note and ESOP Loan indebtedness to Plaintiffs' ESOP Line of Credit indebtedness to SunTrust, thereby ensuring that SunTrust was in a "'superior' position and got paid first from the various securities and loan transactions that were part of the SunTrust ESOP Investment Program." (*Id.* ¶ 16).

In 2004, at or about the time it devised and issued the Term ESOP Loans and ESOP Lines of Credit, SunTrust created and opened certain custody accounts ("Custody Accounts"). SunTrust transferred Plaintiffs' FRNs into the Custody Accounts and held the securities in the Custody Accounts. The Custody Accounts were controlled entirely by SunTrust. SunTrust also required Terry Phillips to open investment management accounts at SunTrust into which certain cash, marketable securities, and other assets were transferred and held as security by SunTrust. SunTrust additionally required Terry Phillips to pledge personal securities accounts at SunTrust Securities, Inc., as security for all obligations of TPS, Phillips Land, LC, and Capitol Distributing, LLC to SunTrust.

Subsequent to all of these loans and investments, Plaintiffs represent that the ESOP Investment Program was an "unmitigated disaster." Plaintiffs obtained none of the tax benefits promised by SunTrust; the purchase the FRNs served no economic purpose and provided no benefit to Plaintiffs; the securities produced a negative rate of return; and the cost to service the Term Loan and ESOP Lines of Credit exceeded any possible benefit of owning and/or holding

the FRNs. (*Id.* ¶ 24). As a result, Plaintiffs incurred substantial losses each and every year in which the Term Loan and ESOP Lines of Credit remained outstanding. Between 2004 and 2013, Plaintiffs were forced to liquidate the FRNs in fixed amounts once a year by exercising options on the underlying securities. SunTrust used the proceeds of the option sales in each year to pay itself fees and commissions and to curtail the Term Loan and ESOP Lines of Credit.

In December 2011, most of Plaintiffs' SunTrust loan facilities, including those that were part of the ESOP Investment Program, matured. Witthoefft then began the process of renewing or modifying Plaintiffs' credit facilities. At the time, the outstanding balance on the ESOP Lines of Credit was approximately $3,900,000 and the outstanding principal amount of the Term Loan was approximately $589,602.48. In addition to the collateral identified above, SunTrust held, as cross-collateral for all of Plaintiffs' obligations, several of Terry Phillips's personal real estate properties, including a home in Salisbury (occupied by Terry Phillips's mother), a vacation home at Smith Mountain Lake, and two waterfront land lots located at Smith Mountain Lake.[3] SunTrust also held an assignment of a $750,000 seller note owned by Terry Phillips relating to a development in Goochland County called Sabot Creek. The $750,000 seller note was secured by a second deed of trust on unsold lots in Sabot Creek. At some point, Witthoefft represented to Terry Phillips that SunTrust would release his personal real estate from SunTrust's security interests upon the sale of certain properties in 2012. In reliance on SunTrust's representations and promises, the properties were sold in October 2012. However, SunTrust and Witthoefft subsequently refused to release any collateral, except of the deed of trust on a vacation home at Smith Mountain Lake.

On April 4, 2013, Terry Phillips attempted to transfer $100,000 in identifiable funds from his investment account at SunTrust. However, SunTrust disapproved the transfer and withheld possession of Terry's funds. On April 5, 2013, Sigmon represented that he would "authorize the release of the hold" on Terry Phillips's investment account. (Compl. ¶ 34).

---

[3] Plaintiffs did not provide the states in which the aforementioned personal real estate properties were located.

However, Terry Phillips was again unable to transfer money from his account on April 8, 2013 because SunTrust had placed a restriction on his account. Later in the day, after Terry Phillips notified Sigmon that SunTrust's actions constituted conversion, Sigmon finally signed paperwork releasing the hold on Terry Phillips's securities accounts.

Presently, the ESOP Investment Program has not been terminated. SunTrust has not provided Plaintiffs with a final accounting or a statement of the losses incurred in connection with the ESOP Investment Program. The balance on Terry and Cathy Phillips's ESOP Line of Credit is now less than $4,000,000. Approximately $4,000,000 in FRNs remain in Terry and Cathy Phillips's Custody Account. SunTrust intends to sell the remaining securities and use the proceeds to pay off Terry and Cathy Phillips's ESOP Line of Credit.

On April 29, 2013, Plaintiffs filed a Complaint in the Circuit Court for the City of Richmond, Virginia alleging multiple tort claims. In Count I, Plaintiffs allege a claim of actual fraud and fraud in the inducement against SunTrust and its agents, including Craighill. In Count II, Plaintiffs allege a claim of securities fraud against SunTrust and its agents, including Craighill. In Count III, Plaintiffs allege a claim of constructive fraud against SunTrust and its agents, including Craighill. In Count IV, Plaintiffs allege a claim of breach of fiduciary duty against SunTrust. In Count V, Plaintiffs allege a claim of breach of custodial trust against SunTrust. In Count VI, Plaintiffs allege a claim of conversion against SunTrust and Sigmon. In Count VII, Plaintiffs allege a claim of breach of contract against SunTrust. In Count VIII, Plaintiffs allege a claim of unjust enrichment against SunTrust.

Plaintiffs request (a) damages in the amount to be determined by a jury, but no less than $19,500,000 including disgorgement of all fees, charges, commissions, profits, and interest income wrongfully obtained by SunTrust from Plaintiffs as a result of the ESOP Investment Program, plus prejudgment interest on such amount at the rate of six percent (6%) per year; (b) punitive damages in the amount of $350,000; (c) post-judgment interest at the maximum rate allowed by law; (d) attorneys' fees under *Bershader* and sections 13.1-522 and 64.2-795 of the

Virginia Code; (e) Plaintiffs' costs incurred in connection with this action; and (f) such other relief as is just and proper.

On July 22, 2013, Defendants removed the above-captioned matter to this Court. Plaintiffs filed a Motion to Remand on August 13, 2013. Defendants filed an Opposition to Plaintiffs' Motion to Remand on August 27, 2013. Plaintiffs' Reply was filed on September 4, 2013. A pretrial conference was scheduled for November 21, 2013, but was cancelled because the Nondiverse Defendants had not been served in this action. On November 14, 2013, the Court DIRECTED Plaintiffs to serve the Nondiverse Defendants FORTHWITH. On January 7, 2014, the Nondiverse Defendants waived service of summons. This matter is now ripe for review.

Plaintiffs are citizens of Virginia. Plaintiffs maintain that the Nondiverse Defendants are each citizens of Virginia, who work or worked for SunTrust. Witthoefft reportedly works at 919 East Main Street, Richmond, Virginia; Sigmon reportedly has an office at 10 Franklin Road, Suite 230, Roanoke, Virginia; and Craighill is reportedly a registered representative who is currently employed by SBK Financial in Richmond, Virginia. SunTrust is a Georgia corporation, with its principal place of business in Atlanta, Georgia.

## II. STANDARD OF REVIEW

"Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal district courts have original jurisdiction over civil actions that arise under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. § 1331, and where the amount in controversy exceeds $75,000 and the matter is between citizens of different states pursuant to 28 U.S.C. § 1332. Federal diversity jurisdiction only exists under § 1332 where there is complete diversity, that is, "when no party shares common citizenship with any party on the other side." *Mayes v. Rapport*, 198 F.3d 457, 461 (4th Cir. 1999) (internal citations omitted). A defendant may remove a case from state to federal court if the federal court has original jurisdiction over the matter, but if a case is removable based solely on diversity

jurisdiction, the case may not be removed if any of the defendants is a citizen of the state where the action was brought. 28 U.S.C. §§ 1441(a), (b).

The party seeking removal has the burden of establishing federal jurisdiction. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). Because removal of a case from state court implicates "significant federalism concerns," removal jurisdiction must be strictly construed, and "if federal jurisdiction is doubtful, a remand is necessary." *Mulcahey*, 29 F.3d. at 151. If at any time before final judgment it appears the district court lacks jurisdiction, the court must remand the case. 28 U.S.C. § 1447(c).

When a defendant has been fraudulently joined, however, complete diversity is not required to create federal jurisdiction premised upon § 1332. Under the fraudulent joinder doctrine, a federal court may assume jurisdiction over a case where there is not complete diversity and dismiss the in-state defendants if it finds that the nondiverse defendants were fraudulently joined in order to destroy the court's federal diversity jurisdiction. *Mayes*, 198 F.3d at 461. "To show fraudulent joinder, the removing party must demonstrate either 'outright fraud in the plaintiff's pleading of jurisdictional facts' or that 'there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court.'" *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999) (quoting *Marshall v. Manville Sales Corp.,* 6 F.3d 229, 232 (4th Cir. 1993)) (internal quotation marks omitted). "The party alleging fraudulent joinder bears a heavy burden—it must show that the plaintiff cannot establish a claim even after resolving all issues of law and fact in the plaintiff's favor. . . . This standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Id.* (internal citations omitted).

"In order to determine whether an attempted joinder is fraudulent, the court is not bound by the allegations of the pleadings, but may instead 'consider the entire record, and determine the basis of joinder by any means available.'" *AIDS Counseling & Testing Centers v. Group W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990) (internal citations omitted). The

Court may consider affidavits and deposition transcripts submitted by the parties, and "[i]n this respect, the 'proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P., Rule 56(b).'" *Beaudoin v. Sites*, 886 F. Supp. 1300, 1302 (E.D. Va. 1995) (internal citations omitted). "The court must rule in favor of the plaintiff if there is 'any reasonable possibility that a state court would rule against the nondiverse defendant.'" *Id.* (citing *Poulos v. NAAS Foods, Inc., et al.*, 959 F.2d 69, 73 (7th Cir. 1992)).

### III.   MOTION TO REMAND

#### A.  Craighill

##### 1. Counts I and III: Fraud, Constructive Fraud, and Fraud in the Inducement

In order to successfully maintain a claim for fraud, a plaintiff must bring an action within two years from the date that the misrepresentation or fraud "is discovered or by the exercise of diligence reasonably should have been discovered." *Hansen v. Stanley Martin Cos., Inc.*, 585 S.E.2d 567, 573 (Va. 2003) (quoting Va. Code § 8.01-249(1)); *see also* Va. Code § 8.01-243(A). Plaintiffs bear the burden "to prove that he acted with due diligence and yet did not discover the fraud or mistake until within the statutory period of limitation immediately preceding the commencement of the action." *Hughes v. Foley,* 128 S.E.2d 261, 263 (Va. 1962). In order to meet the due diligence requirement, a plaintiff must use "[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent [person] under the particular circumstances." *STB Marketing Corp. v. Zolfaghari,* 393 S.E.2d 394, 397 (Va. 1990). "While the Fourth Circuit has not ruled squarely on the question, courts in several other circuits have held, with varying requirements of certainty, that if the statute of limitations has run on a cause of action against a non-diverse defendant, the court may—and in some jurisdictions, must—find joinder of that defendant to be fraudulent." *Riverdale Baptist Church v. Certainteed Corp.*, 349 F. Supp. 2d 943, 949 (D. Md. 2004). "For the most part, however, successful fraudulent joinder/statute of limitations arguments occur in

cases where the issue is fairly easy to determine, either from the face of the complaint or with resort to limited additional evidence, while courts facing more ambiguous factual situations reject such arguments." *Id.*

The underlying facts of Plaintiffs' claims of constructive and actual fraud began in 2003 and 2004. Additionally, as Defendants aver, "any alleged business relationship between Craighill and Plaintiffs that could give rise to any fraud claim . . . ended roughly six years before Plaintiffs filed suit" because Craighill left the employ of SunTrust in the spring of 2007. (Defs. Mem. Opp'n Mot. Remand 8).[4] It is a stretch for Plaintiffs to assert that they "acted with due diligence" and yet contend that they suffered through an "unmitigated disaster" of more than five years of consistent and substantial losses from the ESOP Investment Program before they knew that fraudulent behavior was afoot. Accordingly, Plaintiffs' common law fraud claims against Craighill are time barred.[5]

2.    Count II: Securities Fraud

A two year limitations period applies to Plaintiffs' securities fraud claim against Craighill. Under Virginia Code § 13.1-522(D), "[n]o suit shall be maintained to enforce any liability created under this section unless brought within two years after the transaction upon which it is based." This period is not subject to the "discovery rule" under Virginia Code § 8.01-249. *Carlucci v. Han*, 886 F. Supp. 2d 497, 516 (E.D. Va. 2012) (citing *Cors v. Langham*, 683 F. Supp. 1056, 1058-59 (E.D. Va. 1988)). The transactions at issue occurred in 2003 and 2004. As such, this claim is barred by the applicable statute of limitations.

---

[4] Plaintiffs proffer cases that stand for the proposition that where there is a continuation of services, the statute of limitations does not begin to run until the termination of the undertaking. *See, e.g.*, *Keller v. Denny*, 352 S.E.2d 327, 330-31 (Va. 1987). However, this case law pertains to claims for breach of fiduciary duty and not claims for fraud. *See Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 424 (E.D. Va. 2011); *Goldstein v. Malcolm G. Fries & Assoc., Inc.*, 72 F. Supp. 2d 620, 626 (E.D. Va. 1999). The continuing undertaking exception to the statute of limitations does not apply to fraud actions. *See Hurst v. State Farm Mut. Auto. Ins. Co.*, No. 7:05-CV-00776, 2007 WL 951692, at *2 (W.D. Va. Mar. 23, 2007), *aff'd,* 324 F. App'x 250 (4th Cir. 2009).

[5] Because the statute of limitations defense is dispositive in this matter, the Court need not address whether any other defenses apply to Craighill.

9

**B. Sigmon**

Conversion is defined as the "wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession." *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 709 S.E.2d 163, 171 (Va. 2011) (quoting *Universal C.I.T. Credit Corp. v. Kaplan,* 92 S.E.2d 359, 365 (Va. 1956)). "Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion." *Id.* at 76 (quoting *Kaplan*, 92 S.E.2d at 365).

Plaintiffs contend that in April 2013 Terry Phillips attempted to transfer $100,000 from an investment account at SunTrust. (Compl. ¶ 32). SunTrust then allegedly placed a hold on the account. (*Id.* at ¶ 34). Plaintiffs further allege that on Friday, April 5, 2013 "Sigmon represented that he would 'authorize the release of the hold' on Terry [Phillips's] investment account," but that only on Monday, April 8, 2013, did "Sigmon finally [get] around to signing the 'paperwork' to release the hold[.]" (*Id.* at ¶ 37). Plaintiffs contend that when Sigmon waited a single business day to release the hold on Terry Phillips's account, he committed the tort of conversion. (*Id.* at ¶¶ 69-73).

Previously, on December 16, 2005, Terry Phillips granted SunTrust a security interest in all assets held in the account at issue. At that time, Terry Phillips executed a security agreement ("Account Security Agreement") in which he agreed that he would "keep Collateral at the location(s) previously provided to [SunTrust] until such time as [SunTrust] provides written advance consent to a change of location." (Witthoefft Decl. Ex. G, at 3). Terry Phillips also signed a Confirmation Memorandum regarding the account, which stated that:

> [U]ntil receiving contrary written instructions from SunTrust, distributions from the Account shall be restricted as indicated below:
>
> No withdrawals or distributions, including, without limitation, interest, cash and non-cash liquidating and non-liquidating dividends, principal paydowns and non-cash dividends, shall be permitted.

(Witthoefft Decl. Ex. H, at 1). In short, pursuant to the Account Security Agreement and Confirmation Memorandum, there was no "wrongful exercise or assumption of authority" over the assets in his account and Terry Phillips was not entitled to immediate possession of the funds at issue. Accordingly, Sigmon did not commit conversion. As a result, Sigmon was fraudulently joined.

### C. Witthoefft

Plaintiffs allege a breach of contract claim against Witthoefft. However, Plaintiffs did not include Witthoefft in any of the eight counts in the Complaint. As a threshold matter, Plaintiffs' claim against Witthoefft does not comport with Rule 8 of the Federal Rules of Civil Procedure, which requires that a complaint allege facts showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Further as an agent of SunTrust, Witthoefft cannot be held liable for any alleged contract between Plaintiffs and SunTrust because SunTrust is a disclosed principal. *See Calkins v. Pacel Corp.*, No. 3:07-CV-00025, 2007 WL 2301626, at *2 (W.D. Va. Aug. 7, 2007) (citing *House v. Kirby*, 355 S.E.2d 303, 305 (Va. 1987)). As a result, Witthoefft was fraudulently joined.

### IV.   MOTION TO STRIKE JURY TRIAL DEMANDS

Plaintiffs concede that "[t]here is no question that many, if not all, of the written agreements relating to the ESOP Investment Program contain broad waivers of the right to trial by jury" and they "do not dispute that they signed the written agreements." (Pls.' Mem. Opp'n Mot. Strike Jury Demands 1). Plaintiffs contend, however, that these provisions are unenforceable because the underlying contracts at issue are fraudulent.

The right to a jury trial under the Seventh Amendment is a fundamental right that "can be knowingly and intelligently waived by contract." *Leasing Serv. Corp. v. Crane,* 804 F.2d 828, 832 (4th Cir. 1986). There is, however, a strong federal policy favoring jury trials. *Mowbray v. Zumot,* 536 F. Supp. 2d 617, 620 (D. Md. 2008). As such, courts "indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393 (1937). However, "jury trial waivers in a contract are to be construed broadly to encompass both contract claims

and related tort claims where the causes of action would not exist were it not for the relationship between [the parties], as well as counterclaims whether or not arising from the contract at issue." *Webster Chrysler Jeep, Inc. v. Chrysler Holding LLC*, No. 08-CV-6535, 2012 U.S. Dist. LEXIS 46264, at \*20 (W.D.N.Y. Mar. 30, 2012) (internal quotation marks omitted); *see also Hitachi Credit Am. Corp. v. Signet Bank*, No. 3:96-CV-815, 1997 U.S. Dist. LEXIS 21499, at \*25 (E.D. Va. May 12, 2007), *rev'd on other grounds*, 166 F.3d 614 (4th Cir. 1999).

Generally, a party's contractual jury trial waiver is enforceable unless a party alleges that its agreement to waive its right to a jury trial was itself induced by fraud. *E.g., Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007). Plaintiffs allege nothing of the sort. Instead, they argue that because Virginia law invalidates written agreements procured by fraud, Plaintiffs are not bound by the jury trial waivers in the relevant written agreements. As such, the Court will GRANT Defendants' Motion to Strike Jury Trial Demands.

## V.    CONCLUSION

Because each of the Nondiverse Defendants was fraudulently joined and diversity jurisdiction is present in this matter, Plaintiffs' Motion to Remand will be DENIED. Because Plaintiffs have voluntarily signed multiple waivers of jury trials, the Court will GRANT Defendants' Motion to Strike Jury Trial Demands.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this _____20th_____ day of February 2014.